CHARLOTTE E. LUXMOORE, etc., et al., Appellants, v. HENRY M. WALLACE, et al., Appellees.

199 So. 492

En Banc

Opinion Filed December 19, 1940

Rehearing Denied January 17, 1941

326

*Bussey, Mann & Barton, A. E. Mayo* (Chicago, Illinois), *J. Lewis Hall* and *Keen & Allen,* for Appellants;

*Wm. Rolston Brown* and *Allen Grazier* for Henry M. Wallace, Hugo A. Freund, John N. Stalker and Margaret A. McDonald, Edwin C. Goddard (Ann Arbor, Michigan), for University of Michigan, *Cook, Harris, Barrett, McGlothlin & Drew* for Olivet College and Berea College and *Radebaugh & Radebaugh,* for Rollins College, Appellees.

THOMAS, J.—A bill was filed by the executors of the estate of William H. Hill, deceased, praying for a construction by the Court of the various provisions of testator's will, consisting of fifty-two paragraphs, the first, second, third, fiftieth and fifty-second of which dealt with the payments of debts, bequests to the wife and another person, disinheritance of any beneficiaries who contested the legality of the instrument and revocation of former wills.

In paragraphs 4th to 40th, gifts were made to various persons and the provisions of these parts of the will are much the same, the testator having provided in them that the income from certain bonds particularly described be bequeathed to the respective beneficiaries named during the period of their natural lives. In section 41 the testator gave to a church four of its own bonds which were held by him, and by section 42 fifty thousand dollars in bonds was set

aside for the use of the executors in the construction of a "gymnasium, a chapel or some other suitable building" at a college in Michigan. In section 43 the testator provided for the payment of two thousand dollars to a nephew to whom reference will be made by us when we analyze paragraph numbered 48. The paragraphs, namely, 1 to 3, 41 to 43 and 50 to 52, inclusive, are not brought into question, so in disposing of the controversy our attention will be confined to the ones designated 4th to 40th, 44th to 49th and to the 51st where that may be necessary to disclose the power of the executors.

There is a slight difference in three of these divisions of the paper too unimportant to relate here because immaterial to the matters with which we are dealing, except that there is an ambiguity claimed in paragraph 10 which will be determined later in the opinion.

The significance of the contents of paragraph 44 of the will will develop in the discussion of the controverted points. In it the testator provided that if any errors or duplications should be discovered in the serial numbers of the bonds which he had theretofore listed, the executors were commanded to substitute other bonds sufficient in number "to yield a like income for the benefit of the beneficiaries theretofore named," and they were also directed in this same paragraph to correct any mistakes so that the full purpose of the will might be effectuated.

Of equal importance are the provisions of the following paragraph where it was directed that if any bonds theretofore described should be sold, mislaid, lost or stolen, the executors should pay to the beneficiaries affected by the sale, loss or theft, money equal to the deficiency caused by these circumstances. Next, the direction was given that the receipts from the bonds devised should be paid within thirty days of the maturity dates of the interest coupons,

and then appears a clause which it is necessary to bear in mind in deciding the complex questions presented to us, *id est*, ". . . that should any of the above described bonds ever default in the payment of any of the interest coupons attached thereto, then an amount of money equal to such defaulted interest shall be promptly paid by my Executors out of any money then available in my estate, to the person or persons who have received the income from such defaulted interest coupons."

Of great importance, too, is the succeeding paragraph containing the instruction that upon the maturity of any of the bonds the principal thereof should be reinvested in other similar securities, the income from which should be distributed among the beneficiaries of the original bonds and that if any of the new securities should pay a "lower rate of interest than the rate of interest paid by the matured bonds, then an amount of money equal to such difference in interest . . ., shall be paid to such beneficiary . . . out of any funds in the hands of my Executors, so that each and every beneficiary hereunder shall continue during the period of their natural lives, to receive from my estate, the same amounts of annual income as stipulated above."

Because of the complications of the testament, which will now be apparent to the reader, and although we have not yet concluded our analysis of it, we pause here to make some observations with the hope that by so doing the ultimate conclusion of the Court will be thereby clearer and simpler. In the paragraphs 4 to 40, the testator has persistently used the expression "during the period of their natural lives" and this is repeated in the last part of the will to which we have just referred. In other words, the income from certain bonds was given to the beneficiaries as long as they lived, and in the clause with reference to the reinvestment of moneys received from matured bonds

he repeated that the income of these beneficiaries should continue for the same period, and to that end directed that there should be a repurchase with the proceeds of securities of "a like kind." At this point, having made numerous bequests, he was careful to provide that they should not be affected by any errors he might make to prevent lowering the income of the beneficiaries. With equal care and for the same reasons he sought to forestall any loss of income to the beneficiaries by sales he had had made, or by the loss or theft of any of the securities. Likewise, he anticipated and safeguarded against possible decrease in income by default in the payment of interest by obligors. So, it is apparent to us that he intended that the various bequests in the form of income should not be lessened because of sale or error by the testator, loss, theft, default, maturity, depreciation, or lower interest upon funds invested anew. Because some exception has been made to his phraseology with reference to maintaining the respective incomes at a certain level, we quote the words he chose in the 46th and 47th paragraphs. In the one he provided that the deficiency should be "promptly paid . . . out of any money then available in my estate," and in the other "out of any funds in the hands of my executor."

We proceed to the next paragraph, the 48th. It was there provided that the income from five hundred thousand dollars should be distributed by the executors among his heirs in accordance with the law regulating distribution of intestate estates, with the exception that no part of this money should be paid to a named nephew, and that two persons, whose names appeared, should have shares "the same as though they occupied the relation of nieces to me." Further provision was made for the payment of the portion of any beneficiary under this part of the will to his issue

in event of death, and if he should die without issue, to the surviving heirs at law or distributees.

We reach the 49th paragraph which is of utmost importance because of the reliance placed upon it by the chancellor and by the appellees to support the position that they took in the equity court and are maintaining here. It is the residuary clause and in it the testator directed "that all of the rest, residue and remainder of my estate and the income therefrom, wheresoever situated and of every kind whatsoever, shall be set aside in a special fund to be created by my Executors, and to be known as the 'William H. Hill Scholarship Fund.'" In this portion of the will was detailed a comprehensive plan for the benefit of worthy students who found it necessary to work for an education. The executors were ordered to provide for the use of the income from $250,000 for students of "Bearerr" College and for a like sum for students of Olivet College. He specified the manner of their selection with the coöperation of the "governing bodies" of the institutions, and *requested* that three other colleges, Rollins, Michigan State College and the University of Michigan be considered by the executors in deciding the schools where scholarships should be established under the fund. He *recommended* that the executors adopt a plan for availability of the income from the fund to deserving persons who found it necessary to earn an education, and that the loans to them should be restricted to 75 per cent of their individual expenses. He also made *recommendations* for the supervision of the fund by a board of trustees created by the executors and to be composed of these executors and members of the faculty, including the president of the college, two persons selected by the student beneficiaries from their number, and two business men, who had worked their way through college and who were "self-made," selected from the alumni. He

*suggested* the execution of promissory notes by the borrowers to draw interest at a specified rate after the conclusion of the college work and the deposit of the proceeds from the notes in a revolving fund for like use.

Again we stop, this time to draw the attention of the reader to the particular features of this part of the will, and we say now that we do so because, as the case has developed, the importance of the provisions of paragraphs 4 to 40 has been contrasted by the litigants with the importance of this, paragraph 49, appellants contending that in the former may be found the dominant purpose of the testator, while the appellees claim that in this paragraph is found the dominant purpose.

At the outset it should be noted that the latter is unmistakably a residuary clause and as such it has a definite status in its relation to the other parts of the will. The moneys which accumulated in the residuary fund were by the terms of the will made available to students at various colleges who were in unfortunate financial circumstances and who would, because of the largess of the testator, be thus enabled to obtain an education which might otherwise be denied them. We have italicized some of the verbs employed by the testator in the residuary clause as being important, because from their very nature they do not indicate the determination that the testator showed in making the bequests in paragraphs 4 to 40 and 44 to 47. In the latter he *directed* the correction of mistakes, the substitution of bonds for those lost, stolen or mislaid. He *directed* that the executors "shall pay promptly" from his estate any moneys to cover depreciation because of the default in the payment of bonds. He *directed* the reinvestment of funds received from matured bonds, and that the deficiency between the income of new and old bonds "shall" be paid out of funds in the executors' hands.

In paragraph 49, on the contrary, he made requests, recommendations and suggestions about the administration of the scholarship fund, and the distribution of the amount in it exceeding $500,000.

We have analyzed succinctly the contents of the will except paragraph numbered 51 which named the executors and empowered them to "establish and maintain all such funds, trusts or otherwise as may be necessary for the purpose of carrying into effect all the provisions hereof." They were also authorized to sell real estate, to appoint their own successors and to select a trust company to serve with them.

We state at the outset, without referring to authorities because they may be easily located by reference to our former decisions, that the foundation stone upon which a decision involving the construction of a will should be builded is the intent of the testator as it may be revealed by what he has written. Its dimensions and proportions are to be measured by the language he selected and used, not in isolated words, clauses or paragraphs, but in the entire instrument from the first letter to the last period. With this thought in mind, we approach a solution of the problems which confronted the executors in the distribution and administration of the estate, and which have become ours now in the appeal from the chancellor's decree. Although the distribution of a vast estate was attempted, and because of its vastness and the number of persons whom the testator sought to benefit the matter is somewhat complicated, it may be said that in substance the principal difficulty is really the clash of opinions about the dominant purpose the testator sought to adopt. As we have stated, the appellants urge that the care of the individual beneficiaries was uppermost in his mind, while the appellees, with equal vigor, contend that the scholarship provision, as

compared with those relating to personal beneficiaries, was of greater importance.

Had the value of the securities prevailed after the testator's death in 1929, the controversy would not have arisen. It is because of depreciation of all of them that the executors found themselves in the dilemma which prompted them to seek the aid of the courts to the end that they might properly discharge their duties.

At the risk of adding to the complexities of the litigation, we will detail some of the statistics which were given by a certified public accountant employed by the executors to examine the accounts and records of the estate: $123,400.04 was distributed up to December 31, 1937, and the difference between that amount and the collections was $169.57; there was then a cash balance in the hands of the executors in the sum of $4,380.32; and there were certain liabilities for more than that amount. The total par value of bonds allocated to the annuities was $589,000. At the time of the testator's death he owned bonds of the par value of $1,764,950, in which were included Liberty bonds in the amount of $32,000. There is a considerable default in income from the bonds described in paragraphs 4 to 40, inclusive, of the will, fixed by the accountant at $112,710.47 on the last day of the year 1937, which composed four items: one, $74,845.40, representing accrued interest in default; one, $33,690.07, reduction of interest rates; one, $2,525, interest on bonds not in former inventory; and the last, $1,650, due to duplication of bond numbers. The witness stated that it would be necessary to dispose of "free" bonds of the par value of $170,000 to pay the amount delinquent because of the defaulted income on the bonds set up in paragraphs 4 to 40 of the will. The annual income, according to this witness, on the bonds described in

these paragraphs, had there been no default, would have amounted to $32,155.

Using approximate figures, in disposing of an estate said to have been valued at around three million dollars, the testator made outright gifts of $100,000 and bequeathed the income from $1,400,000, leaving half the estate unallocated.

There is little in the testimony which is of real help to us in a solution of the problems presented, because from that very testimony and from the instrument itself, we are convinced that the difficulties result from a universal depreciation of value of the securities, hence income, which was not anticipated by the testator. He doubtless felt that if the expected income from the bonds described in paragraphs 4 to 40 should for any reason be lessened, there would be ample return from the others in the hands of his executors to supplement it so that the beneficiaries named would at all times be assured of the income he fixed without jeopardizing or decreasing the corpus of the estate.

We understand that there was a decrease in the interest from all securities to the point that it must be decided whether some of the unallocated ones should be converted into cash in order to maintain the level of payments of beneficiaries under paragraphs 4 to 40, a situation which the testator evidently did not contemplate when the will was made. Because of this conception on our part we think it unnecessary to decide questions V and VI, propounded by the appellants, which relate to testimony giving statements of the testator about his intent at the time the will was in process of preparation. We think that the chancellor was uninfluenced by this evidence, and, indeed, he stated in his opinion that the instrument, excepting paragraph 48, was capable of construction from the language used in it.

We have referred to the comparative importance of the provisions respecting incomes and those creating a scholar-

ship fund. That is the principal feature of the litigation. There are, however, other questions which we will decide, namely, the validity of paragraph 48 and the effect of paragraph 10.

The chancellor gave the matter thorough consideration as is evidenced by his exhaustive opinion and he reached the conclusion on the primary question that it was not the intention of the testator that any of the corpus of the estate should be converted into cash to meet deficiencies in the income from the bonds described in paragraphs 4 to 40 of the will, but that he proposed that any shortage in these incomes should be met out of the proceeds in interest from the unallocated bonds "available" in the estate or "in the hands" of the executors. He reasoned (1) that the testator in making his plans intended that any shrinkage in income should be supplied only for cash receipts; and (2) that he did not in reality mean to create annuities, else he would have elimniated the expressions "funds in the hands of my Executors" and "money then available in my estate" so that the executors would have been obligated to pay the exact sums without restriction. We are not able to harmonize the latter view with the language adopted in the document. In the first place, the very term residuary clause, and unquestionably paragraph 49 is one, means provision for disposition of what remains in an estate after the distribution of bequests made in a will. A residuary fund is a reservoir in which is placed all that is left of the estate which the testator has failed to dispose of in legacies and devises and from its very nature and because of its very purpose, it is of importance secondarily to the provisions of the will for specific bequests. It may be appreciated because of an excess above these bequests or devises and on the other hand it may be depreciated to effectuate the other provisions of a will.

"A residuary legatee is one who receives all the testator's personal estate not otherwise effectually disposed of by his will. In other words, a bequest of all the rest, residue and remainder of the personal property after payment of debts and satisfaction of the particular legacies." Husson v. Bensel, 124 Fla. 304, 168 So. 395.

Commendable as was the motive of the testator in this case, with generous provisions for unfortunate college students, nevertheless, the section 49 must be placed in this category.

It seems to us that it would be an improper and impractical construction to make the devise under such a clause the dominant plan of the will. We repeat that in paragraphs 4 to 40 there is an explicit distribution to the beneficiaries named of income for life. In paragraph 47 it was expressly provided that these beneciaries should enjoy for life a stipulated annual income. The testator created a safeguard against diminution by reinvestment, default, loss, theft, sale and error. After all of these provisions he disposed of the residue and remainder in terms much less definite, making recommendations, suggestions and requests. In view of these facts and relying upon the will itself, we have the conviction that to preserve the whole scheme it presents, the corpus of the estate should be applied to insure the maintenance of the annuities, and that this plan itself would be materially affected were we to give the construction to the phrases "money available" and "money in hand" claimed for them by the appellees. A choice must be made because of a situation unanticipated by the testator. In making that choice the Court must be confined to the language employed in drafting the will, and though the construction contended for by the appellees is not without logic, we hold that, following the rule which we announced in the beginning of the consideration of this question that

the whole paper should be considered, the bequest in the residuary clause must give way to those appearing in paragraphs 4 to 40. We conclude that the bequest. to the individuals are to be distributed regardless of the effect it may have on the corpus of the estate, but in so holding do not rule that the discharge of the debts or the costs of administration should be affected.

The chancellor was of the opinion that subdivision 48 of the will was void for uncertainty, as he expressed it, "if not as to takers, then certainly as to *quantum* and amount intended for such takers." He experienced difficulty with the interpretation of that part of the will principally because of the reference to Margaret A. MacDonald and Angus Ella Wanker, who were related to the testator, and to Stephen Thomas, a nephew, whom we have already mentioned and because of the fact that testator's life survived him.

The substance of this chapter is that all of the income from $500,000 should be distributed among those who would be entitled to it "as my heirs at law or distributees under the law governing the distribution of intestate estates." There could be no uncertainty in this clause which would render it invalid as it is entirely practical and feasible to compute the interest of the testator's heirs in accordance with the provisions of law on the subject. The chancellor concluded that the widow was not intended to be included in the heirs at law, and the decision not being challenged on that score no uncertainty in this division of the will, because of the possible interest of the widow, need be considered. . In the second paragraph certain income was left her "in lieu of her dower interest and all other statutory rights and interests in my estate."

It was then stipulated that there should be an exception in the case of Stephen Thomas, a nephew, who should not

participate under that clause. Parenthetically, he had been given the sum of $2,000 under a former provision of the will. After excepting Thomas, it was provided that Margaret A. McDonald and Angus Ella Wanker should also "share and share alike therein with my lawful heirs exactly the same as though they occupied the relationship of nieces to me." The chancellor felt that because of these provisions the parts of the estate that the distributees should take under this portion of the will were not determinable, but we do not experience the obstacles that stood in his way. In the first place, it is entirely clear that the nephew, Thomas, should be ignored in the apportionment of the income from this fund. This nephew had a sister who predeceased the testator leaving only an adopted daughter, who because her adoption had not been perfected in the State of Florida could not inherit. The mother of Thomas and his sister died before the will was made, so the distribution to that branch of the family was obviated. The testator clearly intended that Angus Ella Wanker and Markaret A. MacDonald should take their places in the distribution process as if they had been his nieces. The court found that there was uncertainty in this provision and leaves the impression in his opinion that to fix their status might require the adding of words which a court has no power to do, because it is not clear from the instrument itself whether they had a common father and mother. The stipulation appearing in the record discloses that they were sisters and it is not a violent presumption that the testator knew they were when he provided for them in his will. We think that the rules of construction would not be transgressed by holding that they, being in fact sisters, would inherit under this provision of the will exactly as if they had a common mother or father who was the sister or brother of the testator. In so holding certainly the intention of the testator would be

carried out and, we think, the obvious purpose of this part of the instrument would be fulfilled. We conclude that there was error in striking paragraph 48 of the will for uncertainty.

The next question can be easily determined. It involves the meaning of paragraph 9, where it was provided that each of the five sons of a certain nephew should receive share and share alike all income from bonds described of the par value of fifty thousand dollars. It is contended on behalf of these particular beneficiaries that they were entitled to the income from two hundred and fifty bonds instead of fifty. We agree that the chancellor placed a proper construction on this paragraph, namely, they were entitled to share equally the income from fifty bonds and not that each one of them was entitled to the income from fifty bonds. This is obvious from a consideration of the entire paragraph because a description of the securities appears. Not only were the dates of maturities given, but also the serial numbers and the name of the maker. In view of the particularity with which they are described there can be no room for the interpretation that the income from five times as many was devised.

The last part of the will under scrutiny in this litigation is the one, numbered 10, for the bequest to a nephew of the income from certain bonds described by numbers, rates of interest and name. We give so much of the paragraph as is necessary to comprehension of the point raised: "I give and bequeath unto my nephew . . . during the period of his natural life, all income derived from Nine . . . bonds; also Ten (10) bonds . . .," etc. The appellants contend it was the purpose of the testator to give the income from the first bonds described and to bequeath outright the others. It will be noticed that the two clauses devoted to the respective issues are separated by a semicolon. We

agree with the chancellor in his finding, in favor of the appellees, that it was the intent of the testator to devise the income from the total of nineteen bonds and not to devise the ten bonds outright and the income from nine. This is so apparent from the context that we think it unnecessary to elaborate.

With a desire to preserve the last will and testament of William H. Hill and to carry out as well as may be his wishes for the distribution of the property which he had accumulated in his lifetime, we have answered the questions which have been presented to us. It is our belief that in what we have written the executors, and the courts who have jurisdiction of the subject, will find a guide to further administration of the estate, unhampered by the uncertainty which they have experienced in the past.

Reversed in part and affirmed in part.

TERRELL, C. J., WHITFIELD, BROWN, BUFORD and CHAPMAN, J. J., concur.

Justice ADAMS not participating as authorized by Section 4687, Compiled General Laws of 1927, and Rule 21-A of the Rules of this Court.